Norris, J.
Aaron H. Thornton, guardian of Amias Thornton, was plaintiff in the court of common pleas, and he alleges in his petition that about July 30, 1883, one William Myers, was the *609 .guardian of said Amias Thornton, and that at that date, by the consideration of the probate court of this county, Myers was ordered, as such guardian, to sell certain real estate of his ward, and in pursuance of this order he did sell the real estate to one Edward Beardsley for $4,275. The terms of payment were, $800 cash, $1,000 on January 1, 1884, and the residue was evidenced by seven notes of $300 each, due respectively in one, two, three, four, five, six and seven years from January 1, 1884, and one for $375 due in eight years from January x, 1884. These eight notes bore interest at six per cent, payable annually, and were secured by mortgages on the •premises sold.
He says that in 1880, Myers, in order to secure a loan made to him by Mustill, placed in Mustill’s hands, as collateral security, the last three of these series of notes, two for $300 each and one for $375. Myers was insolvent and he made default in the payment of this loan, and Mustill then bought the notes and paid him the difference between the amount of the notes and the amount of the loan. He says that Mustill knew that these notes represented trust property and was trust property, and that Myers held them as guardian of Thornton, his ward, and that after this purchase, there was paid on said notes to Mustill at different times sums aggregating $987.12.
On March 4, 1896, Myers resigned as guardian of Thornton and was succeeded on April 15, by the defendant in error, Aaron H. Thornton. And the plaintiff below seeks in this petition to recover the amount paid Mustill on these notes and asks for an order that they be delivered to him.
Mustill answers this petition and admits that he bought the last two of the notes. He denies that he got he first of the three. He says that he bought these two notes on July 28, 1890, of Myers, as such guardian; that he paid the full value •of the notes in cash, and that at the time of the purchase, Myers represented to him that it was necessary for him to •obtain money for the use of his ward, and to this end hje ■wished to sell these two notes, and that he, Mustill, believing this, and believing that it was for the benefit of the ward’s estate, purchased the notes. He says that this sale and purchase was for the ward’s interest and that the money received *610 for the notes was actually used by Myers for his ward and that no part of it was appropriated by Myers to his own use. Thisi, the plaintiff, in his. reply, denies.
This case came on for trial at the April term, 1897, in the court of common pleas in this county, and resulted in a verdict for the plaintiff. The usual motion for a new trial was overruled and judgment entered, and error is prosecuted in this court to reverse the proceedings in the court below.
The first complaint in the petition in error is as to the admission of evidence offered by the defendant in error and in the exclusion of evidence offered by the plaintiff in error, in the court below, and the first among these objections, and the one most earnestly insisted upon, is error which occurred in the admission of testimony of Myers.
Myers was the former guardian, the- man who sold these notes, and he was called by the defendant in error, who was the plaintiff below. Myers swears in his testimony in chief that he had borrowed money of Mustill.. He wasn't sure whether he had given his own note to Mustill or not; he says it was a long time ago, and he wouldn’t swear either way, and he was just as uncertain whether he had sold either of these notes to Mustill. He says it was possible he sold them, at least one of them, but he says he wouldn’t swear either way to that, and further along, when the proposition is put to him that $360 was due on one of these notes when it left his hands, for which he only received $300, he appears to be of the opinion that he had not sold-it, and he says “that would go to show that it wasn’t sold outright because I never sold a note for less than its par value.” Myers kept no memorandum. He kept no books. His memory appears to be much at fault and his testimony in chief left the question as. to whether he had sold these notes, or had deposited them as-collateral security, merely for a loan, uncertain and in doubt. Upon his cross-examination, he at once, and without hesitation, declares that he sold these notes to Mustill for the full amount due and received the money for them.
In. the hands of plaintiff’s counsel, Myers is an unwilling witness, his hesitation then and his promptness on cross-examination show that he was hostile to the plaintiff’s case;. *611 though not a party to 'the suit; yet he no doubt considered that his relation to the controversy and his situation were adverse to the plaintiff, and his sudden conviction that he had sold these notes to Mustill was unexpected and a surprise to the plaintiff.
Myers’ testimony was. material to the case in more essentials than one. He had, with the knowledge and consent of Mustill, collected from Beardsley, every payment on these notes, but one; the amount aggregated $540, about. If the notes had been sold, Myers was Mustill’s agent to transact the affairs connected with these notes. For nearly six years, the testimony discloses the transfer of these notes had been kept secret from Beardsley and from everyone, and Mustill appears as anxious to keep it quiet as did Myers. In this regard, they understood each other fully.
On cross-examination, the following question was asked Myers, and a certain paper which I refer to was admitted in evidence, of which plaintiff in error complained, and I will read from the record, page 46, his cross-examination:
“Q. Mr. Mustill did buy those notes of you, did he not? A, He did.
“Q. And he did pay you the money for them? A. Yes.
“Q. And he paid for them the entire value of the notes; you figured them up, and he paid all the notes called for, is that true? A. Yes, sir, that is true.”
This is cross-examination by Mr. Voris. In re-direct ex^ amination. he was asked this question:
“Q. If Mr. Mustill bought those notes from you on July 18, 1890, why was it that on January 20, 1894, you signed a paper reading as follows: T hereby agree with Edwin M. Beardsley to allow the difference in interest between what he can get on money he now has on hand, to pay the claim I held against him at six per cent., the rate said paper bears, from this time to time of settlement, the whole time shall be within one year. Time extended one year. (Signed) Williams Myers, guardian.’
“The witness: I can explain that if you will permit me, why I did.”
*612 Of course objections were urged to this, testimony right along. Objection overruled:
His answer is: “I didn’t care to have Mr. Beardsley know that the notes passed out of my hands, and I expected to sell real estate and buy the notes back from Mr. Mustill, and then deal with Mr. Beardsley. This was my idea at the time I wrote that.”
Afterwards the paper writing, a copy of which I read, was offered in evidence and admitted. To this testimony, the plaintiff in error objected on the ground that Myers, being the witness of the defendant in error, it was not competent for him to prove contradictory statements made before the trial, for the purpose of affecting Myers’ credibility and accuracy.
We find no error in this record on that ground, but" agree with the case of Hurley v. State, 46 Ohio St., 320 [21 N. E. Rep., 645], that such examination affords valuable aid in judicial investigations, and deem it competent for the purpose of proving the conscience of a witness, refreshing his recollection and giving him an opportunity of correcting his testimony, and of explaining his apparent inconsistency. But we consider this declaration of Myers to Beardsley, this act of Myers, admissible upon other grounds. It is substantive evidence of the facts in issue in the case. It is conceded that these notes were a trust fund. Myers, the guardian, the trustee, except for the interest of his ward, had no power to sell them or part with the title to them, and unless it appeared that this was the purpose of the sale, the buyer, Mustill, took no title to them. The notes show on their face that they are a trust fund, and Mustill could in no wise render himself oblivious to this fact, and he is put upon his guard and upon his inquiry.
He knew this, now what did he do? He had these notes endorsed by Myers, a personal endorsement. He helped Myers to conceal the fact, that he had parted with them. He makes Myers his agent to deceive Beardsley and conceal from him the fact that they had" left his hands. No man was to know it for six years; so far as the testimony shows, no man but Myers and Mustill knew but that Myers held those notes as the guardian of this insane man, and not one dollar of the *613 proceeds of these notes can be traced to the benefit of this-ward.
A. J. Wilhelm and B. B. Voris, for Plaintiff in Error.
Young & Wanamaker, for Defendant in- Error.
To keep the notes free from the badge of embezzlement, Myers takes a paper, which is in testimony, and an exhibit in the bill of exceptions, which he calls a receipt. Mustill takes this paper from Myers, and both he and Myers treat it as an evidence of indebtedness, and these payments that Myers made to him are credited upon the back of that paper, and in that endorsement the paper is called, “received on the within note.”'
This declaration of Myers to Beardsley appears to be but Another step in,the common object of these men to conceal the fact from everybody that Mustill held these notes, and Myers says so in terms in his answer to that question. He says that the reason why he wrote that paper, made that communication to Beardsley, was that he wanted to conceal the fact from Beardsley that he had parted with the notes and he wanted to get them back; and Myers, when he made his settlement as the guardian of this man, and Mustill kept the endorsement off, the-paper clean, not a scratch with the pen on the back of either of them, refused this other evidence of indebtedness, made the endorsements of payments on the back of that.
This being the case, we deem the testimony admissible; and not only admissible, but pertinent to the issue in the case. We hold that to admit it, was not error. We find no error in the exclusion of evidence, and no further error in the record; no error in the charge. The judgment of the court below is affirmed at the costs of the plaintiff in error.

Young & Wanamaker, for Defendant in Error, in the Supreme Court, cited:
First: Did the plaintiff in error, Mustill, under the law as laid down by the supreme court of Ohio, obtain a good title to the two notes in question?
The authority which a guardian has to dispose of the personal estate-of his ward is derived from statute, and is governed by sec. 6280, R. S.: Strong v. Strauss 40 Ohio St., 87; Board of Education v. Sinton, 41 Ohio St., 504, 513; Jelke v. Goldsmith, 52 Ohio St., 499, 516 [40 N. E. Rep., 167.]
*614 Second: Was it error to permit the following question to be asked Mr. Myers on redirect examination: “If Mr. Mustill bought these notes from you on July 28, 1890, why was it that in January, 1894, yQU signed a paper reading as follows: T 'hereby agree with Ed. M. Beardsley to allow the difference in interest between what he can get on money he now has in hand to pay the claim I hold against him and six per cent., rate said paper bears from this time' to the time of settlement, which time shall be within one year. Time extended one yearC Signed William Myers, Guardian.” Hurley v. State, 46 Ohio St., 320 [21 N. E. Rep., 645].
Third: -Did the admission of the question, involving Myers’ written statement referred to above, violate the rule that “the statement made by a vendor or grantor after he has parted with his title is mere hearsay, and is not admissible against his grantee or vendee? Hurley v. State, 46 Ohio St., 320 [21 N. E. Rep., 645].